**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

SHIMON ROSENBERG, Individually
as Legal Guardian of M. T. H. and as
Personal Representative of the Estates of
Rivka Holtzberg and Gavriel Noach Holtzberg;

NACHMAN HOLTZBERG, Individually
and on behalf of other family members,
as Surviving Father of Gavriel Noach Holtzberg;

MOSES SHVARZBLAT, Individually
and as proposed Special Administrator of the Estate of
Norma Shvarzblat-Rabinovich;

MARIBETH JESWANI, Individually and
as Special Administrator of the Estate of
Sandeep Jeswani;

KIA SCHERR, Individually and
as proposed Personal Representative of the Estate of
N.S. and Alan Scherr;

EMUNAH CHROMAN, Individually and
as proposed Personal Representative of the Estate of
Ben Zion Chroman;

ANDREINA VARAGONA;

LINDA RAGSDALE;

AUTUMN GILLES

       Plaintiffs,

       v.

JAMAAT UD DAWA (also known as Lashkar e Taiba,
Markaz ud Dawa, Idara Khidmat-e-Khalq and
Tehrik-e-Tahaffuz-e-Qibla Awal); MOHAMED
HAFIZ SAYEED; ZAKI ur REHMAN LAKHVI;
SAJID MAJID (also known as Sajid Mir); AZAM
CHEEMA; MAJOR IQBAL; MAJOR SAMEER ALI,

       Defendants.

------------------------------------------------------------x

Civil Actions:
10-CV-5381 (DLI) (CLP)
10-CV-5382 (DLI) (CLP)
10-CV-5448 (DLI) (CLP)
10-CV-3893 (DLI) (CLP)
10-CV-5816 (DLI) (CLP)

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

Plaintiffs Shimon Rosenberg, Nachman Holtzberg, Moses Shvarzblat, Kia Scherr and

Emunah Chroman, by their attorneys Kreindler & Kreindler LLP and The Silverman Law Firm,

and Plaintiffs Maribeth Jeswani, Andreina Varagona, Linda Ragsdale and Autumn Gilles by their

attorneys Kreindler & Kreindler LLP, allege the following:

## PARTIES

### Plaintiffs

1.      Plaintiff SHIMON ROSENBERG is a citizen and resident of Israel, is the father

of decedent Rivka Holtzberg and is the grandfather of Rivka Holtzberg's and decedent Gavriel

Noach Holtzberg's minor son, M. T. H.  Plaintiff Rosenberg has been appointed by the Family

Matters Court of Nazareth, Israel to be the Legal Guardian of M. T. H., who is a United States

citizen, a past resident of Brooklyn, New York, and a current resident of Afula, Israel.  Plaintiff

ROSENBERG has also been appointed by the Family Matters Court of Tiberias, Israel to be the

Personal Representative of the Estates of Rivka Holtzberg, who was an Israeli citizen and a

resident of Israel and India, and Gavriel Noach Holtzberg, who was a United States citizen and

resident of Brooklyn, New York and of India.  Plaintiff ROSENBERG represents himself

individually, the Estate of Rivka Holtzberg, the Estate of Gavriel Noach Holtzberg, the minor

child M. T. H., and all other remaining survivors of Rivka Holtzberg.

2.      Plaintiff NACHMAN HOLTZBERG is a United States citizen, a resident of

Brooklyn, New York and is the father of decedent Gavriel Noach Holtzberg.  Plaintiff

HOLTZBERG represents himself individually and represents other remaining survivors of

Gavriel Noach Holtzberg.

3.      Plaintiff MOSES SHVARZBLAT is a United States citizen and resident of

Lakewood, New Jersey.  Plaintiff Shvarzblat is the brother of decedent Norma Shvarzblat-

Rabinovich, a citizen and resident of Israel and Mexico. Plaintiff SHVARZBLAT will be appointed a Special Administrator of the Estate of Norma Shvarzblat-Rabinovich. Plaintiff SHVARZBLAT represents himself individually, the Estate of Norma Shvarzblat-Rabinovich and all remaining survivors of Norma Shvarzblat-Rabinovich.

4.     Plaintiff MARIBETH JESWANI is a United States citizen and resident of Cook County, Illinois. Plaintiff JESWANI is the wife of decedent Sandeep Jeswani, a United States citizen and resident of Cook County, Illinois, and a Special Administrator under Illinois law of the Estate of Sandeep Jeswani. Plaintiff JESWANI represents herself individually, the Estate of Sandeep Jeswani and all remaining survivors of Sandeep Jeswani.

5.     Plaintiff KIA SCHERR is a United States citizen and resident of Faber County, Virginia. Plaintiff SCHERR is the wife of decedent Alan Scherr, a United States citizen and resident of Faber County, Virginia and the mother of decedent N.S., a minor child, a United States citizen and resident of Faber County, Virginia. Plaintiff SCHERR will be appointed a Personal Representative under Virginia law of the Estate of Alan Scherr and the Estate of N.S. Plaintiff Scherr represents herself individually, the Estate of Alan Scherr, the Estate of N.S. and all remaining survivors of Alan Scherr and N.S.

6.     Plaintiff EMUNAH CHROMAN is an Israeli citizen and a resident of both the United States and Israel. Plaintiff CHROMAN is the wife of decedent Ben Zion Chroman, who was a United States citizen and a resident of both the United States and Israel. Ben Zion Chroman is survived by his wife Emunah Chroman and their children, Seri, Mordekhayi and Rifka, all of whom hold Israeli citizenship and are in the process of obtaining U.S. citizenship. Plaintiff CHROMAN will be appointed the Personal Representative of the Estate of Ben Zion

3

Chroman and has legal custody and guardianship of the surviving children of Ben Zion Chroman.

7.      Plaintiff ANDREINA VARAGONA is a United States citizen and resident of Nashville, Tennessee.

8.      Plaintiff LINDA RAGSDALE is a United States citizen and resident of Old Hickory, Tennessee.

9.      Plaintiff AUTUMN GILLES is a United States citizen and resident of Lake Oswego, Oregon.

**Defendants**

10.      Defendant JAMAAT UD DAWA, also known as Lashkar-e Tayyiba, Markaz ud Dawa, Idara Khidmat-e-Khalq, and Tehrik-e-Tahaffuz-e-Qibla Awal (hereinafter "LeT") is and was at all relevant times an organization committing acts of international terrorism intended to reach victims who were citizens and residents of, among other places, the United States.  LeT is and was based primarily in Pakistan, although at all relevant times it also maintained cells in the United States, Afghanistan, India, Bangladesh and Iraq.  At the times relevant to this action, the United States government had designated LeT a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996.  At the times relevant to this action, the United States Department of the Treasury had designated LeT as a "specially designated global terrorist" entity pursuant to 31 C.F.R. 595 and 31 C.F.R. 596.

11.      Defendant MOHAMED HAFIZ SAYEED ("Sayeed") is and was at all relevant times a leader, officer and/or director of LeT.  At the times relevant to this action, the United

States Department of the Treasury had designated Sayeed as a "specially designated global terrorist" pursuant to 31 C.F.R. 595 and 31 C.F.R. 596.

12.     Defendant ZAKI ur REHMAN LAKHVI ("Lakhvi") is and was at all relevant times a leader, officer and/or director of LeT. At the time relevant to this action, the United States Department of the Treasury had designated Lakhvi as a "specially designated global terrorist" pursuant to 31 C.F.R. 595 and 31 C.F.R. 596.

13.     Defendant AZAM CHEEMA ("Cheema") is and was at all relevant times a leader, officer and/or director of LeT.  The United States Department of the Treasury has designated Cheema as a "specially designated global terrorist" pursuant to 31 C.F.R. 595 and 31 C.F.R. 596.

14.     Defendant SAJID MAJID, also known as Sajid Mir, ("Majid") is and was at all relevant times a leader, officer and/or director of LeT. The United States Department of the Treasury has designated Majid as a "specially designated global terrorist" pursuant to 31 C.F.R. 595 and 31 C.F.R. 596.

15.     Defendant MAJOR IQBAL ("Major Iqbal") is a resident of Pakistan who participated in planning and funding the Mumbai attacks. Major Iqbal was indicted in the Northern District of Illinois for conspiracy to murder and maim in India and for six counts of murder of U.S. nationals in connection with the Mumbai attacks.

16.     Defendant MAJOR SAMEER ALI ("Major Ali") is a resident of Pakistan who participated in planning and funding the Mumbai attacks.


**JURISDICTION AND VENUE**


5

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1332 (diversity jurisdiction), 28 U.S.C. § 1350 (Alien Tort Statute) and 18 U.S.C. §2333 (Antiterrorism Act).

18.     The acts alleged herein constitute the provision of material support or resources for terrorist acts, including but not limited to the targeting, injuring and killing of United States citizens, and subject all defendants to this Court's personal and subject matter jurisdiction. *See* 28 U.S.C. § 1605A and 18 U.S.C. § 2339 et seq.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(d), in that, as foreign aliens, defendants may be sued in any district. Venue is also proper in this court as several of the plaintiffs reside in this district.

## STATEMENT OF FACTS

20.     Commencing on November 26, 2008, LeT terrorists carried out several deadly attacks in Mumbai, India, killing 166 people and wounding at least 304 people over the course of four days (the "Mumbai terrorist attacks"). The terrorist attacks took place at multiple locations, many of them known to cater to Americans and other foreigners, including the Oberoi Trident Hotel, the Taj Mahal Hotel, the Leopold Café, the Cama and Albless Hospital, the Metro Cinema, the CST Railway Station and the Chabad House.

21.     Ten LeT terrorists, all of Pakistani nationality, mounted the attacks. Nine of the ten terrorists were killed during the siege.

22.     The Mumbai terrorist attack was planned, trained for and carried out by the named defendants who are members of defendant LeT, as well as by Major Iqbal and Major Sameer Ali. The Inter-Services Intelligence Directorate of Pakistan ("the ISI") provided critical planning, material support, control and coordination of the attacks.

6

### The Founding of LeT

23.      Defendant Lakhvi first took up arms in 1984 in Afghanistan during the anti-Soviet jihad, and built up a coterie of fighters around him.  A year later he was followed to Afghanistan by Sayeed, who created an organization called Jamaat ud Dawa (JuD).  In 1986, Lakhvi and Sayeed merged their two organizations into Markaz ud Dawa wal Irshad (MDI), which used social, health and educational programs to engage in radical Islamic proselytizing. According to Hussain Haqqani, former Pakistani Ambassador to the United States, "Markaz . .  was widely known as a training facility for militants."

24.      In 1990, Lashkar e Taiba (LeT), the military arm of MDI, was formed with the support and funding from ISI. LeT would eventually organize and carry out the Mumbai attacks of November 26-28, 2008.

25.      While LeT would eventually include Americans as targets of its terrorist activities, it was originally intended to be a vehicle for turning young Kashmiri men into fighters in the anti-Soviet war in Afghanistan. In the period after the Soviet Army's withdrawal from Afghanistan, the ISI focused MDI and LeT's activities on Kashmir, a disputed region claimed by both Pakistan and India.  The ISI organized the training and operational plans of the LeT and controlled the infiltration of trained LeT members into the Indian controlled section of Kashmir for terror missions.

26.      In 1992, in support of a letter from Secretary of State James Baker to Pakistani Prime Minister Nawaz Sharif, U.S. Ambassador Platt wrote, "We are very confident of our information that your intelligence service, the Inter-Services Intelligence Directorate, and elements of the Army, are supporting Kashmiri and Sikh militants who carry out acts of terrorism. . . This support takes the form of providing weapons, training, and assistance in

7

infiltration. . . There is no doubt in our mind about this. . . Our information is certain.  It does not come from the Indian government."  A Pakistani government senior official, Hussain Haqqani, attended a meeting a few days later to discuss the US position.  During the meeting the ISI Director argued that the Jihad was at a critical stage and should not be interrupted.  ISI Director-General Javed Nasir continued, "We have been covering our tracks so far and will cover them even better in the future."

27.     David Hicks, an Australian citizen who was captured and debriefed at Guantanamo Bay Detention Camp, confirmed that in 1999, he trained with LeT and then waited several months to infiltrate into Kashmir through crossings, a number of which were controlled by the ISI.

28.     By December 2000, the LeT had extended its jihadist activities beyond the Kashmir region and carried out a terrorist attack in the capital of India, killing three people.

29.     LeT propaganda claims that over the course of its Jihad in India, it has killed a total of 14,000 Indians.

30.     The role of LeT and ISI in terrorist activities has been recognized by the Foreign Secretary of the United Kingdom, a country with centuries of experience in the India-Pakistan region, who, in a statement to the British Parliament said that "[a] number of these terrorist organizations including Lashkar e Toiba . . .have been at the forefront of violent activity in [Kashmir].  … Her Majesty's Government accepts that there is a clear link between the [ISI] and those groups."

**LeT becomes JuD**

31.     On December 20, 2001, in response to LeT's December 2001 terrorist attack on India's parliament, the United States Department of State designated it as a Foreign Terrorist

Organization and the U.S. Treasury Department designated it as a Specially Designated Global Terrorist.

32.     On January 12, 2002 LeT was outlawed by Pakistan

33.     In response, LeT changed its name to Jamaat ud Dawa (JuD).

34.     JuD stayed in the same offices, used the same phone numbers and bank accounts, operated the same website and was managed by the same people as LeT.  Hussain Haqqani, the Pakistani Ambassador to the United States at the time of the Mumbai attacks wrote, "[a]fter the U.S. froze Lashkar-e-Taiba's [LeT's] assets and called for it to be banned, Sayeed changed his organization's name in Pakistan to Jamaat-ul-Dawa (the Society for Preaching)."  Jamaat ud Dawa was also the original name of Sayeed's organization established in the 1980s. (See supra ¶ 23)

35.     On May 2, 2005, the United Nations Security Council listed LeT as an entity subject to sanctions for its support of terrorism.

36.     In April 2006, JuD was designated as a Foreign Terrorist Organization by the US State Department.

37.     On December 10, 2008, the U.N. Security Council amended the sanctions listing for LeT to include the alias Jamaat Ud Dawa.  The original imposition of sanctions and the amendment required the unanimous consent of all fifteen members of the Security Council.

38.     The only LeT attacker to survive the Mumbai attack, Mohamed Kasab, told an Indian Court that he first became aware of LeT in 2007, when it was fundraising for jihad door-to-door under the name of Jamaat ud Dawa.  Kasab further explained to the Court that "after Lashkar-e-Taiba was banned in 2002 it started its activities in the name of Jamaat-ud-Dawa."

39.     In 2009, United States Secretary of State Hilary Clinton wrote, "We believe that LeT uses JUD facilities as a public front for its activities and shares offices, phone numbers, personnel and bank accounts.  LeT's old offices merely changed the name on the door."

40.     In 2010, the United States Department of the Treasury wrote, "Following the [U.S.] designation of Lashkar E-Tayyiba (LT) in December 2001 and Pakistan's banning of the group in January 2002, LT renamed itself Jamaat ud Dawa (JUD) in an effort to evade sanctions.  Despite the name change, the same leaders that form the core of LT remain in charge of JUD."

### LeT threatens the United States

41.     In May 2001 Sayeed wrote an editorial entitled "American Terrorism" in the JuD English language magazine, *The Voice,* in which he pledged that jihad against the greatest power on earth (the U.S.) would continue until the end of tyranny and disbelief in Islam, and that in the end jihad would defeat what the LeT referred to as American terrorism.

42.     Immediately after 9/11, Sayeed, as the head of Markaz Dawa and LeT, again wrote in *The Voice*, blaming Americans for massacring the Afghans and using Usama Bin Laden as a scapegoat for the 9/11 attacks that he claimed were the work of the Zionists.

43.     LeT continued to regularly advance anti-American propaganda on its website, using such terms as "terrorist U.S. filthy soldiers" and the "stink due to the smell of rotting American and British troops."

44.     Sayeed wrote that the US was one of the principal enemies of Islam and Pakistan, "The U.S., India and Israel had joined hands and were planning joint action against Pakistan."

45.     In January 2002 the Pakistani government outlawed LeT and shortly thereafter arrested its leader, Sayeed. But just a few days after Sayeed's arrest, the ISI quietly released him.

As the former Pakistani Ambassador to the United States, Hussain Haqqani put it, "[i]t was clear that the ISI was not keen to offend its jihadi partners by keeping them in prison for too long."

46.     For a short period thereafter, under pressure of American scrutiny, and financial payoffs by the ISI to Sayeed, LeT went dormant.

47.     However, by April 2003, Sayeed resurfaced and, as the leader of LeT, again called for jihad against America and other enemies: "We must fight against the evil trio: America, Israel and India." Sayeed called for Pakistan to arm Iraq with nuclear weapons in its fight against the Americans, but was very clear on his weapon of choice, "[s]uicide missions are in accordance with Islam. In fact, a suicide attack is the best form of jihad."

48.     At this time LeT issued numerous posters, including one which showed a weapon hitting the U.S. Capitol Building. Another poster showed an automatic rifle being fired and the bullets piercing India and entering the U.S. and Israel. The black and white banner of the LeT waved overhead.

49.     Between early 2001 and 2003, LeT trained Americans in Pakistan and re-deployed them to a cell in Virginia with the intention to commit a terrorist attack in the United States.

50.     Sajid Majid was involved in advising the Virginia-based group in choosing targets, equipment purchase and surveillance. In May 2003, after a long investigation, the FBI made arrests in Virginia and discovered automatic weapons, manuals for constructing explosives and a photo of the FBI headquarters in Washington DC.

51.     ISI training of LeT continued. According to a publication of the U.S. Department of Defense, up to 1,000 men from LeT and an allied terrorist organization were trained annually at the ISI camps.

52.     In 2003, the ISI under pressure from the American government, reduced its presence in Kashmir and surreptitiously moved its anti-Indian operations to the southern Pakistani city of Karachi, where it launched what became known as the Karachi Project. According to an article published by the Counter Terrorism Center at the U.S. Military Academy at West Point, "[t]he Karachi Project has allegedly mobilized militant and criminal syndicates—both Pakistani and fugitive Indian nationals—as part of a new wave of proxy wars targeting Indian urban centers from Karachi."

53.     According to Steven Tankel a leading expert on the LeT, in 2003 and 2004, JuD offices in Pakistan were used to recruit fighters for Iraq. LeT then sent the trainees to fight against U.S. troops in Iraq.  Ahmed Dilshad, LeT's Deputy Senior Commander who long argued in favor of expanding LeT's jihad beyond Kashmir and India, was captured in Baghdad in March, 2004. Dilshad was an assistant to defendant Lakhvi, one of the leaders of LeT.

54.     In 2004 Azam Cheema was appointed head of external operational planning for LeT.  Cheema, known to the Indian government as the intelligence chief of LeT, had close operational and financial ties to the ISI.

55.     In 2004, Interpol issued a Red Corner Notice for Cheema under the charge of "conspiracy to import a consignment of illegal arms and explosives into India."  A Red Corner Notice is issued in order "to seek the location and arrest of wanted persons with a view to extradition or similar lawful action."  Pakistan and the ISI ignored the notice and Cheema continued to live in a palatial residence in Bahawalpur travelling around in a Land Cruiser with six bodyguards.

56.     LeT undertook numerous terrorist acts in India, including attacks on the Indian

Parliament in 2001, in New Delhi in 2005, Bangalore in 2005, and Mumbai in 2006. The 2006

bombings on the Mumbai train system which killed over 200 people were overseen by Cheema.

57.     In 2008, prior to the Mumbai attacks, LeT joined with other Pakistan-based

terrorist groups in making surreptitious attacks on U.S. forces in Afghanistan.

58.     Lakhvi trained LeT recruits in suicide attacks, and was the trainer of the attackers

who perpetrated the 2008 Mumbai terrorist attacks.

**Preparation for the 2008 Mumbai terrorist attacks**

59.     A significant portion of the planning of the 2008 Mumbai terrorist attacks was

carried out in the United States by David Coleman Headley ("Headley"), a.k.a Daoud Gilani, a

U.S. citizen who was born in the U.S., studied in Pakistan and returned to the U.S. at the age of

seventeen.  Headley was eventually captured and prosecuted by the U.S. Department of Justice.

He pleaded guilty and cooperated with the U.S. Government by providing information regarding

the 2008 Mumbai terror attacks that was corroborated by other evidence. He testified against his

co-defendant Tahawwur Hussain Rana in the 2011 trial in the Northern District of Illinois.

60.     Headley attended his first meeting with the LeT in 2000, when he went to

Pakistan.  At that meeting, Headley heard Sayeed speaking about the importance of jihad.

Headley was motivated by Sayeed saying that "one second spent conducting jihad was superior

to 100 years of worship."

61.     In February 2002, Headley took his first training course at the LeT camp within

the Markaz ud Dawa complex in Muridke, Pakistan.  The course generally consisted of

ideological and religious indoctrination.  His second course, in August 2002, included small arms

training and was held in Muzaffarabad, Pakistan.  Headley's third LeT training course took place

in March 2003, also near Muzaffarabad, focused entirely on military training. His fourth course

was in August 2003, in Manshera, and involved intelligence aspects such as setting up a safe

house, performing dead drops, and surveillance. The LeT training camps in Muridke,

Muzaffarabad and Manshera were also attended by the Mumbai attackers.

62.     At the conclusion of his training with the LeT, Headley expressed a desire to go

and fight in Kashmir, but was told by Lakhvi that the LeT had something better in mind for him.

Headley informed Lakhvi that he had a U.S. passport.

63.     In July 2004, at an LeT leadership conference, Headley had lunch with Lakhvi

and Sayeed and discussed coordination between LeT and the ISI.

64.     According to the Indian Home Secretary, the ISI was "literally controlling and

coordinating the [2008 Mumbai] attack from beginning to end".

65.     Major Iqbal was the contact or handler for Headley for the Mumbai terror attacks,

and was actively involved in the planning and execution of the attacks.

66.     By the summer of 2005, Headley had been assigned to Majid's group within LeT.

67.     In late 2005, while back in the U.S., Headley began the process of changing his

name from Daoud Gilani to David Headley. He did this in order to hide any evidence of his

Pakistani origin so he could travel into India without scrutiny.

68.     In 2006, Headley travelled with Major Pasha, an ex Pakistani military officer who

was also a trainer for the LeT, to a town on the Pakistan-Afghanistan border in order to discuss

the smuggling of weapons into India. Headley and Pasha were arrested by the police. While in

custody, they spoke to Major Ali and informed him of their activities on behalf of LeT. Major

Ali asked for Headley's contacts and Headley and Pasha were released. Several days later,

Headley was contacted by Major Iqbal.

69.     In the spring of 2006, Headley, his name change complete and a new passport issued in his new name, returned to Pakistan, where he received an assignment from Majid to relocate to Mumbai, India.  Before relocating, Headley met with Major Iqbal, who, Headley discovered, already knew Headley's assignment. Headley and Major Iqbal discussed the idea of providing a cover for their activities in Mumbai by opening a business whose ostensible purpose was facilitating emigration from India to the U.S.  Major Iqbal told Headley that he believed this to be a perfect cover story considering the amount of respect that such a business would garner. Major Iqbal provided Headley with $25,000 to establish and operate the First World Immigration office in Mumbai, and to cover Headley's living expenses in Mumbai.  Major Iqbal advised Headley to avoid traveling to Mumbai through Pakistan, and instructed Headley, upon settling in Mumbai and opening the immigration office, to take photographs and videotapes of various Mumbai locations, particularly public areas. LeT concurred with the idea of Headley opening an office in Mumbai.

70.     According to the U.S. government's proffer  in the criminal case against Headley, over the following three years, "Headley met with Major Iqbal and his associates many times. During these meetings, Headley was trained in various topics, including spotting and assessing people, recognizing Indian military insignia and movements, dead drops and pick up points, and clandestine photography."

71.     Headley also met with Lakhvi and Majid and briefed them on his upcoming trip to Mumbai.  Majid told Headley to make sure he filmed the Taj Mahal Hotel.

72.     Headley went to Mumbai, rented an apartment, opened the immigration office and performed surveillance as requested by Major Iqbal, Lakhvi and Majid.  He filmed the Taj Mahal Hotel and its surroundings.

73.     In approximately December 2006, Headley returned to Pakistan.  He met with Major Iqbal and debriefed him on the surveillance completed in Mumbai.  Headley also provided Major Iqbal with a memory card containing the videos he had taken in Mumbai.

74.     Before returning to Mumbai, Headley met again with Majid and Major Iqbal. They instructed Headley to take more detailed footage of the Taj Mahal hotel, including the conference rooms, where, as Major Iqbal explained to Headley, the hotel hosted conferences. Major Iqbal told Headley that Headley's assignment in Mumbai had been discussed with Majid.

75.     In February 2007 Headley again returned to Pakistan, after his second trip to Mumbai. He handed over to Major Iqbal and Majid two memory cards, one containing videos of Mumbai, and the other containing videos of a different location.

76.     Major Iqbal asked Headley to obtain a schedule of conferences to be held at the Taj Mahal hotel.  He also gave Headley a cell phone that could record video and instructed him on how to surreptitiously use it, which Major Iqbal referred to as "clandestine photography."

77.     In or about September 2007, Headley made his third trip to Mumbai to conduct surveillance.  During this trip, as instructed, he took further surveillance of several locations, including the Taj Mahal hotel.

78.     Headley returned to Pakistan in November 2007.  While in Pakistan, Headley met with Major Iqbal and Majid several times.  As in the previous meetings, Headley debriefed them on his surveillance activities and provided them with a memory card containing the most recent videos.  Major Iqbal gave Headley approximately $20,000 in Indian currency to cover his expenses in India.

79.     A month later, at a December 2007 meeting with Majid in the Muzaffarabad office of LeT, Majid first discussed with Headley an armed attack on the Taj Mahal Hotel. During the meeting, Majid had a Styrofoam mock-up of the Taj Mahal Hotel as a prop.

80.     Headley had several further meetings with Majid while he was in Pakistan. During one of these meetings, at which Lakhvi, several other senior members of LeT, and a member of the Pakistani military were present, they discussed potential landing sites for a team of LeT attackers who would arrive in Mumbai by sea.

*81.*     In April 2008, Headley returned to Mumbai and performed further surveillance of the Taj Mahal Hotel and of potential landing sites for the LeT attackers. After completing these surveillance activities, Headley returned to Pakistan. As before, Headley reported to Majid, Lakhvi and Major Iqbal about his activities and provided them copies of videos. They discussed landing sites for the attackers and the potential for the attackers to use taxis after landing. Headley also related to Major Iqbal the discussions that Headley had with LeT regarding the planning of and preparation for the attacks.

82.     During the planning for the Mumbai attacks, Majid sent an email to Headley signed with the name Wasi, an aka for Majid that would later be used by Majid when he made phone calls to the LeT team to provide them instructions during the Mumbai attacks.

83.     In June 2008, Headley again met with Majid, Lakhvi and Major Iqbal in Pakistan. They discussed further targets for the LeT attackers. Major Iqbal chose as a target the Chabad House (a Jewish center in Mumbai), telling Headley that it "was to be added to whatever list there was . . . " Majid also supported the choice of the Chabad House as a target. They informed Headley that surveillance of the Chabad House was to be his last surveillance trip before the attack.

84.     In July 2008, Headley returned to Mumbai.  He performed surveillance on the Chabad House, reporting that it was difficult to find as it was down a blind alley.  He also took videotape of the Oberoi Hotel even though it was not on the original list of targets.  He reported it was very close to the proposed attackers' landing site.

85.     After this final trip to Mumbai, Headley returned to Pakistan and met with Major Iqbal and Majid, reporting to them on his surveillance and turning over new videos.

86.     Majid informed Headley that he (Majid) was training the LeT attack team in Muzaffarabad.  According to Headley "[t]hey were being trained in close-quarter battle, fighting in built-up areas, and explosives."

87.     In late 2007, an initial group of thirty-two young men began training at three LeT camps, Muridke, Muzaffarabad and Manshera in Pakistan.  The group was trained in the use and manufacture of small arms and explosives, and indoctrinated in the importance of suicide attacks.

88.     During the initial course of their training at the MDI compound in Muridke, just north of Lahore, Pakistan, they were first introduced to Sayeed and Lakhvi who urged on them the importance of jihad.

89.     In February 2008, a second course of training took place at another LeT facility in Manshera. In May 2008 the third level of training began  at Muzaffarabad in which, according to the sole surviving attacker, "they were turned into solid jihadis."  They were taught to dismantle, assemble and fire many weapons, operate grenades and rocket launchers, and trained in the use of satellite phones, GPS and map reading, along with arduous physical activity in the mountains. The training camp had numerous instructors, and Sayeed and Lakhvi acted in leadership positions.

18

90.     LeT propaganda repeatedly carried messages from Sayeed and Lakhvi, based out of the Muzaffarabad training camp, exhorting trainees to excel at jihad.

91.     After the end of training at the third training camp, the 15 trainees who managed to complete it travelled to an LeT encampment where they met with Sayeed, who anointed them with noms de guerre. They were then sent to the MDI facility at Muridke for advanced training in surveillance, intelligence gathering and counter-intelligence.

92.     Cheema had been the head of external operational planning for LeT and in 2008 became operations adviser to Lakhvi for the Mumbai attacks. Cheema trained the LeT group of ten attackers in surveillance, bomb making and infiltrations skills.

93.     In late September 2008, the trainees travelled to Karachi for several days of marine training and then returned to Muridke where they met with Sayeed and Lakhvi to review the marine-based training. By now, two more of their cohort had dropped out and another six of the group were dispatched to Kashmir by Sayeed and Lakhvi on a suicide mission. Three new trainees joined and the Mumbai group of ten was now complete.

94.     On October 13, 2008 the Mumbai ten met with Sayeed, Lakhvi and Major General Saab from the ISI. Sayeed and Lakhvi told them that their mission was ready and that the target was Mumbai. They would attack from the sea. The ten then gave a demonstration of weapons proficiency to Sayeed, Lakhvi and the ISI General.

95.     Sayeed and Lakhvi then divided the ten into five pairs of two. Lakhvi told them the attack was scheduled for October 27 and Sayeed informed them that in order to weaken the Indian city of Mumbai, the attack must concentrate on places frequented by foreigners such as the Oberoi Hotel, the Taj Mahal Hotel and the Chabad House. Sayeed instructed them that while firing they should specifically target Americans and Israelis.

19

96.     Lakhvi then instructed the pairs that were slated to attack the hotels to set the hotels on fire and attempt to cause damage on a large scale.  Sayeed fixed the attack time as 7:30 P.M., when the sites would be most crowded.

97.     The ten LeT trainees then accompanied Sayeed, Lakhvi and others to a large hall in which were mounted big TV screens and a laptop computer accessing Google Earth.  They were shown details of the roads inside Mumbai leading from one potential target to another.  They were told this was a 'control room' of the media wing of LeT.

98.     On October 17, 2008, the group of ten returned to Karachi.  On October 20, Lakhvi visited the ten at the LeT guesthouse in Karachi and informed them that the attack had been put on hold.  He did not explain why.

99.     Throughout the period of training and preparation, Sayeed, Lakhvi, Majid and Cheema supervised and closely monitored the group of ten.

### The Attacks of November 26-29, 2008

100.     On November 21, 2008, Lakhvi informed the ten trained terrorists that their mission was ready.  He distributed cellphones and instructions on the use of the phones.  The LeT arranged virtual numbers using Voice over Internet Protocol.  LeT purchased this virtual number account from Callphonex, the brand name of a U.S.-based company.

101.     On the morning of November 22, 2008, after receiving final instructions from Lakhvi, the ten LeT-trained terrorists left Karachi aboard two boats, at least one of which belonged to Lakhvi.  The team was accompanied by Majid.

102.     The LeT team captured an Indian fishing trawler, killed everyone on board except the captain, and forced the captain to navigate the fishing boat 550 kilometers back to the port of Mumbai.  The route was retraced via GPS tracking from the LeT members' cell phones recovered

after the attacks. At least two of the crew of the Indian fishing boat were reportedly killed by Majid, who then returned to Karachi and oversaw the rest of the Mumbai attack by telephone from an operational center.

103.     The terrorists eventually murdered the captain of the Indian vessel, four miles outside of the port, at the direction, via cell phone, of LeT handlers back in Karachi. The ten attackers then transferred into an inflatable dingy and in the evening of November 26, 2008, after dark, they set foot ashore at Badhwar Park in Mumbai. At this point, back in the Karachi safe house, Major Ali was meeting with Lakhvi.

104.     As planned by Sayeed and Lakhvi, the group of ten broke into five teams of two. Each team took taxis to their intended targets. The LeT teams planted explosives in two of the taxis which later exploded, killing their drivers.

105.     A main target of the attacks included the CST Railway Station where 58 people died and 104 were injured. Another target was the Leopold Café and Bar, a Mumbai institution popular with foreigners as well as Indians. Ten people were killed by small arms fire and grenades. The terrorists then moved on to the Taj Mahal Hotel.

106.     The Taj Mahal Hotel, situated about 500 meters from the Leopold Café, is another Mumbai icon. Just after 9:30 PM on November 26, two pairs of terrorists entered the hotel from separate entrances and opened fire. Twenty people were killed in the first few minutes.

107.     According to eye witnesses in the Taj Mahal Hotel, the LeT terrorists demanded to see the passports of the hotel guests and expressly targeted U.S. passport holders.

108.     The murder, kidnapping and terrorizing of the hotel guests and staff continued for nearly sixty hours until Indian authorities retook the hotel. Altogether, thirty-two people were

killed in the Taj Mahal Hotel.  Throughout the attack on the Taj Mahal, the two LeT teams were in telephone contact with, and took instructions from, their handlers, including Majid and Cheema in the control room in Karachi, Pakistan.

109.    At 10 PM on the evening of November 26, one team of the LeT entered the Oberoi Hotel and began firing indiscriminately.  They advanced into the crowded restaurant of the hotel.

110.    The LeT terrorists began asking people for their passports, seeking to identify U.S. and British nationals.

111.    Alan Scherr, his fourteen-year old daughter N.S., Andreina Varagona, and Linda Ragsdale were part of a twenty-five person group visiting India.  On the evening of November 26 they, along with two other members of their group, were dining in the Tiffin Restaurant on the ground floor of the Oberoi Hotel.  The LeT team first attacked the lobby of the hotel and then moved into the adjoining restaurant.  The six guests dived under the table.  Two were shot and wounded including Andreina Varagona and Linda Ragsdale.  Ms. Varagona had her hand on Alan Scherr encouraging him to be quiet when a bullet entered the back of his head, eventually causing his death.  His daughter, N.S. was shot at the same time and also died.

112.    The other four victims escaped, under fire through the kitchen and into the street, with the assistance of the Indian restaurant staff.

113.    The LeT team continued to murder and terrorize innocent civilians in the Oberoi Hotel for forty-two hours until the Indian authorities regained control.  Thirty-three people were killed in the attack on the Oberoi.

114.    The fifth target, chosen by Major Iqbal, was the Chabad House, a five story building owned and operated by a Jewish organization as a welcome drop-in center for travelers to India.

115.    The LeT team stormed the building and took female hostages. They also went room to room and killed the occupants.

116.    Throughout the attack on the Chabad House, the LeT duo maintained telephone contact with their handlers in Karachi, Pakistan, including Majid. Majid was the one who gave the order to the LeT team in the Chabad House to murder their hostages. After several repeated orders, they did so, killing the hostages while Majid listened in.

117.    LeT member Zabiuddin Ansari, who had instructed the terrorists in Hindi phrases such as how to hail a taxi, was one of those present in the control room in Karachi during the attacks. After his arrest in Saudi Arabia and extradition to India, he reportedly told the Indian National Investigation Agency that Major Ali had met with Lakhvi in the control room at the commencement of the attacks. Ansari also stated that Majid and Cheema were in the control room during the four days of the attack.

118.    At the end of the fourth day, as the attacks were approaching completion, all present in the control room erupted in self-congratulation.

## The Aftermath of Mumbai

119.    On December 7, 2008 Pakistani police raided the LeT facility at Muzaffarabad and arrested twelve people. One of them was Lakhvi. Immediately after Lakhvi's arrest the ISI reportedly dismantled the Karachi control room.

120.    In December 2008, Sayeed and Lakhvi were listed by the United Nations Security Council as associated with the terror group LeT.

23

121.     David Headley, the American involved in planning the attack in the U.S. and performing surveillance in the two years prior to the attacks, contacted Major Iqbal.  Major Iqbal was very concerned with the attention that the Mumbai attacks had received and instructed Headley to lay low.  Headley then met with Major Iqbal who instructed Headley to remove any incriminating materials from his house, and to avoid further contact with him.

122.     On October 27, 2009 Interpol issued Red-Corner Notices for the arrest of Sayeed and Lakhvi on charges of international crime and terrorism.  On October 7, 2010 Interpol issued Red-Corner Notices for the arrest of Major Iqbal, Major Ali and Majid on charges of international crime and terrorism.  Red Corner Notices are issued in order "to seek the location and arrest of wanted persons with a view to extradition or similar lawful action."

123.     In April 2012, the US State Department offered a $10 million reward for information leading to the arrest of Sayeed.  The reward notice stated: "Sayeed participated in the planning of the 4-day-long terrorist attack on Mumbai in November 2008 that left 166 individuals dead, including six U.S. citizens."

124.     According to the United States Ambassador to Pakistan, Hussain Haqqani, "Mumbai exposed the fruits of previous ISI policy to create Lashkar-e-Taiba and still threatens potential conflict between nuclear powers."

125.     After the Mumbai attacks, Pakistan's President Zardari finally admitted that Pakistan had "created and nurtured" terror groups such as LeT.  "The terrorists of today were the heroes of yesteryears."

**COUNT ONE**

**WRONGFUL DEATH CLAIM AGAINST
LeT, SAYEED, LAKHVI, CHEEMA, MAJID,
MAJOR IQBAL and MAJOR ALI**

24

126.    Plaintiffs hereby restate and adopt the allegations in paragraphs 1- 125 above as if fully set forth herein.

127.    On and prior to November 26, 2008, LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali were directly engaged in acts of international terrorism, including but not limited to acts of torture, extrajudicial killing, sabotage and hostage taking, which acts were intended to target, hurt and kill United States citizens, among others.

128.    On and prior to November 26, 2008, LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali were directly engaged in the provision of material support or resources, including but not limited to provision of property; services; currency, monetary instruments or financial securities; financial services; lodging; training; expert advice or assistance; safe houses; false documentation or identification; communications equipment; facilities; weapons; lethal substances; explosives; personnel and/or transportation, to further and aid the international acts of torture, extrajudicial killing, sabotage and hostage taking, which acts were intended to and did target, hurt and kill United States citizens, among others.

129.    On and prior to November 26, 2008, LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali directed, engaged and/or relied upon the efforts of United States-based individuals, including but not limited to Headley, for raising funds, building a network of connections, recruiting participants and planning the operation of the Mumbai terrorist attack.

130.    The support, planning, organization and funding of the Mumbai terrorist attack came from, among other places, United States sources.

131.    The actions of LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali constitute direct "acts of international terrorism" as defined in 18 U.S.C. § 2331 and further constitute violations of the criminal laws of the United States, including, but not limited to, the

provisions set forth in 18 U.S.C. §§ 2339A, 2339B and 2339C, which prohibit the provision of material support and resources to terrorist organizations. These actions were dangerous to human life, transcended national boundaries and were intended to (or would reasonably be interpreted as intending to) intimidate or coerce a civilian population or to influence the policy of a government by intimidation or coercion.

132.   As a direct and proximate result of the direct acts of international terrorism committed by LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali, as set forth above, those defendants have caused plaintiffs, plaintiffs' decedents and the decedents' family members to suffer severe and permanent injuries, damages and losses, including but not limited to the following:

a.      Economic damages, including but not limited to, the pecuniary losses suffered by plaintiffs and decedents' remaining survivors, as a result of decedent's death, including but not limited to, loss of support, loss of services, loss of parental care and guidance, and loss of prospective inheritance; and

b.      Non-economic damages, including but not limited to, the loss of consortium, solatium, society, companionship, care, comfort and love suffered by plaintiffs and decedent's other survivors.

133.   By reason of the foregoing, LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali are each liable to plaintiffs, individually and as the personal representatives or special administrators and/or surviving family members of plaintiffs' decedents, for compensatory damages in excess of $75,000, such amount to be determined by a jury.

134.   Further, for their willful, wanton and criminal misconduct, LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali are each liable to plaintiffs, individually and as the

personal representatives or special administrators and/or surviving family member of plaintiffs' decedents, for punitive damages in excess of $75,000, such amount to be determined by a jury.

135.     This Court has the authority and jurisdiction to hear plaintiffs' claims and award plaintiffs damages pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity jurisdiction), 1350 (alien tort claims act) and 18 U.S.C. § 2333 (Antiterrorism Act).

**COUNT TWO**

**SURVIVAL CLAIM AGAINST**
**LeT, SAYEED, LAKHVI, CHEEMA, MAJID,**
**MAJOR IQBAL and MAJOR ALI**

136.     Plaintiffs restate and adopt the allegations in paragraphs 1- 135 above as if fully set forth herein.

137.     As a direct and proximate result of the direct acts of defendants LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali, decedents suffered conscious pain and suffering and fear of impending death, entitling their estates to compensatory damages under governing law.

138.     By reason of the foregoing, defendants LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali are each liable to plaintiffs, as the personal representatives or special administrators of plaintiffs' decedents, for compensatory damages in excess of $75,000, such amount to be determined by a jury.

139.     Further, for their willful, wanton and criminal misconduct, defendants LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali are each liable to plaintiffs, individually and as the special administrators or personal representatives and/or surviving family members of plaintiffs' decedents, for punitive damages in excess of $75,000, such amount to be determined by a jury.

140.     This Court has the authority and jurisdiction to hear plaintiffs' claims and award

plaintiffs damages pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity

jurisdiction), 1350 (alien tort claims act) and 18 U.S.C. § 2333 (Antiterrorism Act).

## COUNT THREE

### PERSONAL INJURY CLAIMS AGAINST
### LeT, SAYEED, LAKHVI, CHEEMA, MAJID,
### MAJOR IQBAL and MAJOR ALI

141.     Plaintiffs restate and adopt the allegations in paragraphs 1-140 above as if fully

set forth herein.

142.     During the planning and execution of the Mumbai terrorist attack, defendants

LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali acted intentionally and

recklessly.

143.     During the planning and execution of the Mumbai terrorist attack, the conduct of

defendants LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali was extreme and

outrageous.  This extreme and outrageous conduct included, but was not limited to taking

hostages at the Oberoi Trident Hotel and the Chabad House and directing that those hostages,

including plaintiffs M.T.H., Varagona, Ragsdale and Gilles suffer physical and mental injury.

144.     As a direct and proximate result of the direct acts of international terrorism

committed by the LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali, as set forth

above, those defendants have caused plaintiffs M.T.H., Varagona, Ragsdale and Gilles to suffer

severe and permanent physical, mental and emotional injuries, damages and losses, including but

not limited to the following:

      a.   Non-economic damages, including but not limited to, losses suffered as a result of his or her physical, mental and emotional injuries, including pain and suffering and his or her loss of enjoyment of life; and

      b.   Economic damages, including but not limited to the loss of earnings, loss of earning capacity and medical expenses.

145.    As a direct and proximate result of the intentional, reckless, extreme and outrageous acts of LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali, plaintiffs M.T.H., Varagona, Ragsdale and Gilles have suffered and continue to suffer from severe emotional distress and plaintiff M.T.H., Varagona, Ragsdale and Gilles have suffered and continue to suffer from their physical injuries.

146.    Defendants LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali intended for plaintiffs M.T.H., Varagona, Ragsdale and Gilles to suffer from their severe injuries and distress or were aware of a high probability that their conduct would cause such injuries and distress.

147.    By reason of the foregoing, defendants LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali are each liable to plaintiffs M.T.H., Varagona, Ragsdale and Gilles for compensatory damages in excess of $75,000, such amount to be determined by a jury.

148.    Further, for their willful, wanton and criminal misconduct, LeT, Sayeed, Lakhvi, Cheema, Majid, Major Iqbal and Major Ali are each liable to plaintiffs M.T.H., Varagona, Ragsdale and Gilles for punitive damages in excess of $75,000, such amount to be determined by a jury.

149.    This Court has the authority and jurisdiction to hear plaintiffs' claims and award plaintiffs damages pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity jurisdiction), 1350 (alien tort claims act) and.18 U.S.C. § 2333 (Antiterrorism Act).

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York
        October 30, 2014

                              KREINDLER & KREINDLER

                  By:     _____/s/ James P. Kreindler_____
                          James P. Kreindler (JK7084)
                          750 Third Avenue
                          New York, NY  10017-5590
                          (212) 687-8181
                          (212) 972-9432 (Fax)